# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

SCOTT COLLUMS                                        CIVIL ACTION

VERSUS                                               NO. 16-184-BAJ-EWD

CAROLYN W. COLVIN,
ACTING COMMISSIONER OF SOCIAL
SECURITY ADMINISTRATION


## NOTICE

Please take notice that the attached Magistrate Judge's Report has been filed with the Clerk of the U. S. District Court.

In accordance with 28 U.S.C. § 636(b)(1), you have 14 days after being served with the attached report to file written objections to the proposed findings of fact, conclusions of law, and recommendations set forth therein. Failure to file written objections to the proposed findings, conclusions and recommendations within 14 days after being served will bar you, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Court.

ABSOLUTELY NO EXTENSION OF TIME SHALL BE GRANTED TO FILE WRITTEN OBJECTIONS TO THE MAGISTRATE JUDGE'S REPORT.

Signed in Baton Rouge, Louisiana, on August 28, 2017.


**ERIN WILDER-DOOMES**
**UNITED STATES MAGISTRATE JUDGE**

**UNITED STATES DISTRICT COURT**

**MIDDLE DISTRICT OF LOUISIANA**

| | |
|---|---|
| **SCOTT COLLUMS** | **CIVIL ACTION** |
| **VERSUS** | **NO. 16-184-BAJ-EWD** |
| **CAROLYN W. COLVIN,**<br>**ACTING COMMISSIONER OF SOCIAL**<br>**SECURITY ADMINISTRATION** | |

<u>**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**[1]</u>

Danny L. Collums brought this action on behalf of his deceased son, Scott Brandon Collums ("Plaintiff") under 42 U.S.C. § 405(g), seeking judicial review of the final decision of Carolyn W. Colvin, acting Commissioner of the Social Security Administration (the "Commissioner"), denying Plaintiff's application for Title II disability insurance.[2]  Mr. Collums has filed a Memorandum in Support of Appeal[3] and the Commissioner has filed an Opposition Memorandum.[4]  Based on the applicable standard of review under § 405(g) and the analysis that follows, it is the recommendation of this Court that the Commissioner's decision be **AFFIRMED** and this action be **DISMISSED WITH PREJUDICE.**

I.      **Procedural Background**

Plaintiff filed an application for disability insurance benefits on November 7, 2010, alleging disability beginning April 24, 2009.[5]  The claim was initially denied on August 2, 2011[6]

---

[1] References to documents filed in this case are designated by "R. Doc. at [page numbers]."  References to the record of administrative proceedings filed in this case are designated by "AR [page numbers]."
[2] *See,* AR pp. 1-6, 17-43.
[3] R. Doc. 10.
[4] R. Doc. 12.
[5] AR pp. 238-39.
[6] AR pp. 113-124.

and Plaintiff filed a request for a hearing on September 29, 2011.[7]  A video hearing was held on May 18, 2012, at which Plaintiff, represented by counsel, appeared and testified.[8]  By correspondence dated June 1, 2012, Plaintiff, through his counsel, amended his alleged onset date to August 14, 2010.[9]  On July 6, 2012, an unfavorable decision was rendered by the Administrative Law Judge ("ALJ").[10]

On September 10, 2012, Plaintiff appealed the ALJ's July 6, 2012 decision.[11]  Although the request for review was untimely filed, the Appeals Council of the Office of Disability Adjudication and Review ("Appeals Council") found that Plaintiff had shown good cause for the late filing and remanded Plaintiff's case back to an ALJ for a new hearing on September 27, 2013.[12] A second hearing was held on May 23, 2014, at which Plaintiff, represented by counsel, appeared and testified.[13]  A vocational expert, Heward X. Johnson II, also appeared and testified.[14]  An unfavorable decision was rendered by the ALJ on August 29, 2014[15] and Plaintiff filed an appeal on October 27, 2014.[16]  While the appeal was pending, Plaintiff died on June 28, 2015 and Mr. Collums was substituted as party plaintiff in this matter.[17]  On January 28, 2016, after granting two requests for an extension of time,[18] the Appeals Counsel denied Plaintiff's request for review.[19] Accordingly, Plaintiff exhausted his administrative remedies with regard to his application before seeking judicial review and the ALJ's decision is the Commissioner's final decision for purposes

---

[7] AR pp. 157-58.
[8] AR pp. 85-112.
[9] AR pp. 251-52.
[10] AR pp. 125-145.
[11] AR p. 194.
[12] AR pp. 146-150.
[13] AR pp. 44-84.
[14] AR pp. 74-82.
[15] AR pp. 17-43.
[16] AR p. 15.
[17] AR p. 453.
[18] AR pp. 7-14.
[19] AR pp. 1-6.

of judicial review.  *See*, 20 C.F.R. § 404.981.  On March 21, 2016, Danny Collums timely filed a Complaint in this Court.[20]

## II.    Standard of Review

This Court's review of the Commissioner's decision denying disability benefits is limited to an inquiry into whether there is substantial evidence to support the findings of the Commissioner and whether the correct legal standards were applied.  42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971); *Myers v. Apfel*, 238 F.3d 617, 619 (5th Cir. 2001).  If the Commissioner fails to apply the correct legal standards, or provide a reviewing court with a sufficient basis to determine that the correct legal principles were followed, it is grounds for reversal.  *Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1981); *Western v. Harris*, 633 F.2d 1204, 1206 (5th Cir. 1981).

If substantial evidence supports the Commissioner's findings, they are conclusive and must be affirmed.  *Richardson*, 402 U.S. at 390, 91 S.Ct. at 1422; *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995).  "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Bradley*, 809 F.2d at 1057 (quoting *Deters v. Secretary of Health, Educ. & Welfare*, 789 F.2d 1181, 1185 (5th Cir. 1986)).  A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision.  *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001) (quoting *Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir. 2000)).  Conflicts in the evidence are for the Commissioner to decide, and if substantial evidence is found to support the decision, the decision must be affirmed even if there is evidence on the other side.  *Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002); *Selders v. Sullivan*, 914 F.2d 614, 617 (5th Cir. 1990).

---

[20] R. Doc. 1.

In applying the substantial evidence standard the court must review the entire record as a whole, but may not reweigh the evidence, try the issues de novo, or substitute its judgment for that of the Commissioner, even if the evidence weighs against the Commissioner's decision. *Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000).

## III.    The ALJ's Disability Determination

A social security disability claimant has the burden of proving that he or she suffers from a disability, which is defined as a medically determinable physical or mental impairment lasting at least 12 months that prevents the claimant from engaging in substantial gainful activity. 20 C.F.R. §§ 404.1505, 416.905. In determining disability, the Commissioner, through the ALJ, works through a five-step sequential evaluation process. *See,* 20 C.F.R. § 404.1520(a)(4). Using the five-step evaluation process, the Commissioner must determine whether: (1) the claimant is currently engaged in substantial gainful activity; (2) the claimant has a severe impairment(s); (3) the impairment(s) meets or equals the severity of a listed impairment in subpart P of Appendix 1 of 20 C.F.R. part 404; (4) the impairment(s) prevents the claimant from performing past relevant work; and (5) the impairment(s) prevents the claimant from doing any other work. *Masterson v. Barnhart*, 309 F.3d 267, 271 (5th Cir. 2002).

The burden rests upon the claimant throughout the first four steps of this five-step process to prove disability. If the claimant is successful in sustaining his burden at each of the first four levels then the burden shifts to the Commissioner at step five. At step five of the analysis, the Commissioner must prove, considering the claimant's residual functional capacity, age, education, and past work experience, that he or she is capable of performing other work. 20 C.F.R. § 404.1520(g)(1). If the Commissioner proves other work exists which the claimant can perform,

the claimant is given the chance to prove that he or she cannot, in fact, perform that work. *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991).

Here, the ALJ found that Plaintiff was not disabled within the meaning of the Social Security Act from the amended onset date of August 14, 2010 through August 29, 2014, the date of the ALJ's decision.[21]  At step one of the analysis, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the amended onset date of August 14, 2010.[22]  At the second step of the analysis, the ALJ found that Plaintiff had the following severe impairments: status post intracerebral hemorrhage of 2004, degenerative disc disease (DDD) of the cervical spine, attention deficit hyperactivity disorder (ADHD), cognitive disorder, anxiety disorder, pain disorder, major depressive disorder (MDD), post-traumatic stress disorder (PTSD), personality disorder and history of polysubstance abuse.[23]  At step three of the analysis, the ALJ found that Plaintiff's impairments or combination of impairments did not meet or medically equal the required criteria for any listed impairment, stating that, "Objective evidence has been primarily negative."[24]  The ALJ further found that, "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision."[25]

The ALJ then found that Plaintiff had the residual functional capacity ("RFC") to:

> perform light work as defined in 20 CFR 404.1567(b) except which allows for avoidance of climbing ladders, ropes and scaffolds, occasionally climbing stairs and ramps, occasionally balancing, stooping, crouching, kneeling and crawling, with a prohibition against work exposing claimant to moving, hazardous and

---

[21] AR pp. 17-43.
[22] AR p. 22.
[23] AR p. 22.
[24] AR pp. 22-23.
[25] AR p. 33.

dangerous machinery, unprotected heights and commercial driving, which involves simple and repetitive tasks, with occasional and superficial contact with the public, co-workers and supervisors, in work environments that do not require fast paced work and production quotas.[26]

Based on this RFC determination, the ALJ concluded that Plaintiff was unable to perform any past relevant work at step four of the analysis.[27]  Proceeding to step five, the ALJ found that based on the testimony of the vocational expert, as well as Plaintiff's age, education, work experience, and RFC, there are other jobs that exist in significant numbers in the national economy that Plaintiff can perform, including marker, cleaner polisher and cleaner.[28]  Thus, the ALJ concluded that Plaintiff was not disabled from August 14, 2010 August 29, 2014, the date of the ALJ's decision.[29]

## IV.    Plaintiff's Allegations of Error

Mr. Collums alleges that the ALJ committed reversible error by failing to fully consider or weigh the results and opinion of a neuropsychological evaluation, which assessed Plaintiff with limitations that support a finding of disability at step five of the analysis.  Mr. Collums also asserts that the ALJ erred by failing to accept Plaintiff's concentration impairment based on an incomplete

---

[26] AR p. 26.
[27] AR p. 35.
[28] R. Doc. 35.
[29] AR p. 36.

and erroneous analysis of the objective medical evidence.[30]  The Commissioner maintains that the decision to deny Plaintiff benefits is supported by substantial evidence and should be affirmed.[31]

## V.  Analysis

### A.  The ALJ's RFC Determination

Although not a model of clarity, it appears that Mr. Collums' second assignment of error alleges that the ALJ erred in her RFC assessment by failing to include any limitations regarding Plaintiff's back pain.[32]  Mr. Collums contends that the record shows Plaintiff had a history of chronic and severe pain despite the use of narcotic pain medications and pain procedures, including nerve blocks and epidural steroid injections ("ESIs").  Mr. Collums asserts that the ALJ rejected Plaintiff's complaints regarding concentration, persistence, pace and pain due to an alleged lack of objective findings, asserting that the studies were "primarily negative" and that Plaintiff's complaints were "grossly embellished."[33]  Mr. Collums alleges that the ALJ chose to discuss only the evidence that tended to support her findings and, in doing so, the ALJ ignored the vast amount

---

[30] R. Doc. 10-1 at 9-10.  In his Memorandum in Support, Mr. Collums also asserts that Plaintiff's medical records show that Plaintiff "meet[s] all of the criteria of § 1.04(A) of the Listings."  R. Doc. 10-1 at 3 & 15 (footnote omitted).  Mr. Collums, however, does not specifically allege that the ALJ erred at step three of the sequential analysis by failing to find that Plaintiff's impairments meet or medically equal the required criteria for any listed impairment, including Listing 1.04(A).  However, even if Mr. Collums had alleged such error in his Memorandum in Support, there is no evidence in the record that shows Plaintiff meets the requirements of Listing 1.04(A).  As an initial matter, the objective medical records show that Plaintiff was able to move all extremities without difficulty.  *See*, AR pp. 894, 896, 902.  Further, the primary "objective medical evidence" relied upon by Mr. Collums to show that Plaintiff meets the requirements of Listing 1.04(A) is a July 29, 2008 treatment note from Dr. Arnold Feldman, M.D., whose examination of Plaintiff revealed "positive SLR bilaterally right greater than left," which Mr. Collums describes as "a positive straight leg raising test bilaterally."  R. Doc. 10-1 at 3 (*citing* AR p. 734).  Not only does the July 29, 2008 treatment note predate Plaintiff's amended onset date of August 14, 2010, but the note fails to indicate that the straight-leg test results were positive in both the sitting and supine positions, as required by Listing 1.04(A).  In addition, there is nothing in the record that shows Plaintiff was unable to ambulate effectively or that he was unable to perform fine and gross movements effectively on a sustained basis, as required by Listing 1.04(A).  *See, Smith v. Astrue,* 914 F. Supp. 2d 764, 784 (E.D. La. 2012) (*quoting* 20 C.F.R. Part 404, Subpt. P., App. 1, § 1.00(B)(2)(a)) ("As the introductory paragraphs to the Section 1.00 listings make clear, a claimant is required to prove a loss of function as a result of a musculoskeletal impairment by demonstrating either an '. . . inability to ambulate effectively on a sustained basis . . ., or the inability to perform fine and gross movements effectively on a sustained basis . . .'").
[31] *See generally,* R. Doc. 12.
[32] R. Doc. 10-1 at 13.
[33] R. Doc. 10-1 at 14 (*citing* AR pp. 22-23).

of evidence that shows Plaintiff suffers from an acute lumbar radiculopathy. Mr. Collums asserts that these objective medical findings refute the ALJ's assertions as to the alleged lack of objective evidence and the ALJ's conclusion as to "grossly embellished" symptomology.[34]

In response, the Commissioner asserts that the ALJ properly found that Plaintiff's medical evidence does not support Plaintiff's alleged pain symptoms.[35] The Commissioner points out that Mr. Collums relies on medical records from 2007, 2008 and 2009, which precede Plaintiff's alleged onset date of August 14, 2010, as well as records regarding medical imaging of Plaintiff's cervical spine, rather than his lumbar spine.[36] The Commissioner asserts that Plaintiff's contemporaneous medical reports contradict his testimony of incapacitating pain due to an acute L5-S1 radiculopathy, and support the ALJ's assessment of more moderate limitations. As such, the Commissioner maintains that the ALJ's findings are supported by substantial evidence and properly within her discretion as the administrative finder of fact.

### 1. The Objective Medical Evidence

#### a. Medical Evidence Prior to Alleged Onset

A review of the medical evidence shows that Plaintiff was involved in a motorcycle accident on May 22, 2004, during which Plaintiff struck his head and lost consciousness.[37] Plaintiff was treated at Our Lady of the Lake Regional Medical Center ("OLOL"), where an initial CT scan of his brain was negative.[38] According to the treatment notes from OLOL, Plaintiff was taken to St. Elizabeth Hospital on May 26, 2004 complaining of headaches, nausea, and vomiting.[39] A CT scan of Plaintiff's brain revealed an intracerebral hemorrhage in the right frontal

---

[34] R. Doc. 10-1 at 14-15.
[35] R. Doc. 12 at 9.
[36] R. Doc. 12 at 8.
[37] AR p. 461.
[38] AR p. 461.
[39] AR p 461.

lobe without any mass effect and a small contusion was seen at the right skull base over the right orbital roof.[40]  A total body bone scan, however, yielded negative results, showing no evidence for fractures in the lumbar spine.[41]  The treatment notes from OLOL show that Plaintiff "remained neurologically intact," but he was transferred to OLOL for a neurological evaluation.[42]  Plaintiff was subsequently discharged from OLOL with a diagnosis of right frontal intracerebral hemorrhage after a motorcycle accident.[43]  Plaintiff's physical exam was normal.[44]

On June 22, 2006, Plaintiff underwent testing to "determine the presence of neurological abnormality in the lower extremities" based upon his complaints of gait disturbance, numbness in the legs, "pins and needles" sensation in the legs, lumbar spasm, atrophy, and positive Kemp's test.[45]  Dr. David A. Reisbord, M.D., performed nerve conduction studies of Plaintiff's bilateral lower extremity limbs, which revealed a slight prolongation of right tibial motor distal latency.[46]

From November 8, 2007 through November 16, 2009, Plaintiff saw Dr. Paul C. Kramm, M.D., a pain management specialist, who administered a series of ESIs and selected nerve root blocks to Plaintiff's thoracic, cervical and lumbar areas at T4-T5, T5-T6, L5-S1 and C2-C3 to address Plaintiff's complaints of lower back pain.[47]  Dr. Kramm referred Plaintiff to physical therapy and in a treatment note dated November 29, 2007, Lorrain Mackay, P.T., assessed Plaintiff's symptoms as "being driven by a highly sensitized nervous system, with dural and neural irritability, that with even minimal provocation reproduces and increases irritability of his

---

[40] AR p. 461; *See,* AR p. 458.
[41] AR p. 459.
[42] AR p. 461.
[43] AR pp. 462, 468.
[44] AR pp. 461-62.
[45] AR pp. 470-71.
[46] AR p. 470.
[47] AR pp. 506-575; *See,* AR pp. 486-96; 506; 876.

symptoms. He also has some right SI irritability and hypermobility and L4/5/S1 discogenic irritability with thoracolumbar irritability."[48]

By letter dated March 5, 2009, Dr. Kramm informed Plaintiff that he could no longer be Plaintiff's physician because Plaintiff had violated the narcotics contract agreement that Plaintiff had previously signed with Dr. Kramm.[49] Notwithstanding his termination on November 17, 2009, Dr. Kramm issued a "To Whom it May Concern" letter on November 17, 2009, stating that he had administered several ESIs to Plaintiff for his complaints of neck and back pain, which seemed to help more with Plaintiff's back pain than his neck pain.[50] The letter also states that based upon Plaintiff's reports of leg pain, a vascular assessment was performed by Dr. Joseph M. Griffin, M.D., on September 2, 2009, who found no vascular component to Plaintiff's lower extremity pains.[51] According to Dr. Kramm's treatment notes, Plaintiff was prescribed the medications of Neurontin, Soma, OxyContin and Roxicodone.[52]

On November 6, 2009, Plaintiff returned to the emergency room at OLOL for complaints of "bilateral lower extremity tingling and numbness increasing over," which he related to an intracranial hemorrhage from a motorcycle accident in 2003.[53] A physical examination revealed that Plaintiff's back was "Nontender" and had a normal range of motion.[54] The treatment notes show an impression of "Chronic lower extremity neuropathic pain."[55]

Plaintiff also sought sporadic treatment from Dr. Arnold Feldman, M.D., an orthopedic specialist, from July 2008 through October 2010 for complaints of lower back pain with radiation

---

[48] AR p. 510.
[49] AR p. 498.
[50] AR p. 506.
[51] AR p. 504, 506.
[52] AR pp. 507-09.
[53] AR p. 663.
[54] AR p. 664.
[55] AR p. 664.

into his legs.[56]  X-Rays taken of Plaintiff's cervical spine on July 29, 2008 were found to have

"mild narrowing at C5-6"[57]  X-Rays of Plaintiff's lumbar spine dated July 29, 2008 were

interpreted as negative and two MRIs of the lumbar spine, taken on July 29, 2008 and February

26, 2009, were normal.[58]  The treatment notes from Plaintiff's second visit with Dr. Feldman on

July 29, 2008[59] show that an evaluation of Plaintiff's lower back pain revealed lumbar scoliosis,

loss of lordosis, tender lumbar spine, left quadriceps atrophy, absent L5 reflex bilaterally,

depressed S1 reflex bilaterally, L5-S1 sensory deficit on the right, a positive Patrick's bilaterally,

an enlarged facet at L5-S1 and an annular bulge at L5-S1.[60]  A February 26, 2009 MRI of Plaintiff's

thoracic spine was normal.[61]  A March 5, 2009 MRI of Plaintiff's cervical spine showed right

lateral disc herniation with suspected right neuroforaminal compromise at C5-C6.[62]

On July 27, 2010, Plaintiff sought emergency care at St. Elizabeth's Hospital for injuries

sustained as a passenger in a car involved in a motor vehicle accident.[63]  The treatment notes show

that the driver was arrested for DUI and that Plaintiff requested medication for pain and nausea.[64]

Plaintiff was given an intramuscular injection of Phenergan and discharged from the ER the same

day.[65]  Plaintiff returned to OLOL on July 29, 2010 for injuries sustained in the accident, reporting

headaches, neck pain, numbness in both feet, nausea and inability to focus.[66]  An X-Ray of

Plaintiff's right shoulder and a CT scan of his head were interpreted as negative for any

---

[56] AR pp. 616-26.
[57] AR p. 638.
[58] AR pp. 632-34.
[59] AR pp. 732-35.  The treatment notes indicate that Plaintiff visited Dr. Feldman on three separate occasions, but all of the treatment notes list Plaintiff's visit date as July 29, 2008.  *See*, AR pp. 731, 732, 736.
[60] AR pp. 734-35.
[61] AR p. 631.
[62] AR p. 630.
[63] AR p. 586.
[64] AR p. 586.
[65] AR p. 587.
[66] AR p. 659.

pathology.[67]  An X-Ray of Plaintiff's cervical spine showed mild degenerative changes at C5-C6.[68] Plaintiff was discharged with diagnoses of acute post-concussive syndrome, acute neck strain and acute right shoulder pain.[69]

### b. Medical Evidence After Alleged Onset Date

Dr. Feldman's medical records also include X-Rays of Plaintiff's cervical spine dated October 14, 2010, after the amended onset date of August 14, 2010, which revealed disc space narrowing and osteophyte formation at C4-C5, C5-C6 and C6-C7, indicating cervical spondylosis and mild facet arthropathy most pronounced at the C5-C6 level.[70]  X-Rays of Plaintiff's thoracic spine dated October 14, 2010 were interpreted as normal.[71]

From August 2010 through October 2011 Plaintiff sought treatment from Dr. Kevin P. McCarthy, M.D. at the Bone and Joint Clinic.[72]  Treatment notes from January 5, 2011 state that X-Rays of Plaintiff's lumbosacral spine were relatively benign with some sclerotic changes at the facets at the lower levels to include L4-L5 and L5-S1, but were negative for acute fracture or dislocation.[73]  A lumbar myelogram study dated January 19, 2011 was similarly interpreted as normal with no problems detected at L1-L2 and L5-S1.[74]  On February 11, 2011, based upon a referral from Dr. McCarthy, Plaintiff saw Dr. Gregory Ward, M.D., who performed nerve conduction studies on Plaintiff's bilateral extremities, including needle EMG studies.[75]  The EMG studies revealed "evidence of mild acute L5 S1 radiculopathy on the left."[76]  In Dr. McCarthy's

---

[67] AR pp. 656-57.
[68] AR p. 657.
[69] AR p. 661.
[70] AR p. 636.
[71] AR p. 637.
[72] AR pp. 680-712; 892-915.
[73] AR p. 683.
[74] AR pp. 691-92.
[75] AR p. 706.
[76] AR p. 706.

February 22, 2011 treatment note, Plaintiff was described as taking narcotic pain relief medication with a noted history of drug abuse.[77] Dr. McCarthy performed two ESIs on February 25, 2011 and March 29, 2011, but Plaintiff only reported good relief from the first ESI.[78] The treatment note from March 29, 2011 shows that Dr. McCarthy had given Plaintiff a preoperative and postoperative diagnosis of lumbar radiculopathy.[79]

On May 26, 2011, Dr. Charles Lee, M.D., reviewed Plaintiff's disability file at the request of Disability Determination Services ("DDS").[80] Dr. Lee issued Plaintiff an RFC for a reduced range of light work that allowed for sitting, standing and walking up to six hours in an eight-hour workday, unlimited pushing/pulling of hands/feet, prohibition against climbing ladders, ropes and scaffolds, occasional climbing ramps and stairs, stooping, kneeling, crouching and crawling and frequently balancing.[81]

In an August 5, 2011 treatment note, Dr. McCarthy noted that Plaintiff had been referred to a Dr. Turnipseed for spinal cord stimulator trial, but Dr. Turnipseed had treated Plaintiff with medial branch blocks and a rhizotomy instead.[82] The August 5, 2011 treatment note further provides that Dr. McCarthy intended to refer Plaintiff for "eval and treat and spinal cord stimulator trial. If he responds favorably to this then he may be a candidate for permanent placement. There was nothing else from a surgical perspective at this point other than possible spinal cord stimulator implant at this time."[83] Plaintiff was discharged from Dr. McCarthy's clinic on October 4, 2011.[84]

---

[77] AR p. 682.
[78] AR pp. 687-90; 896-97.
[79] AR p. 687.
[80] AR pp. 114-24.
[81] AR pp. 120-24.
[82] AR p. 895.
[83] AR p. 895.
[84] AR p. 894.

Plaintiff also sought treatment from Dr. Mark O. Edwards, M.D., from August 27, 2007 through March 12, 2014, for various complaints, including pharyngitis, bronchitis, ADHD, lumbar disc disease with radiculopathy of the legs, GAD, depression, upper respiratory infections, tooth pain, tobacco use and hypogonadism.[85] Although difficult to read, the treatment notes from March 7, 2011, June 15, 2011 and August 2, 2011 include a diagnosis of "lumbar disc dz."[86] Dr. Edwards' treatment notes from January 21, 2012 and March 2, 2012 also show that Plaintiff was diagnosed with "lumbar pain"[87] and "lumbar/leg pain."[88] At Plaintiff's last office visit on March 12, 2014, Plaintiff was diagnosed with lumbar disc degenerative disease, ADHD and GAD.[89]

## 2. The ALJ's RFC Determination is Supported by Substantial Evidence

The ALJ "is responsible for assessing the medical evidence and determining the claimant's residual functional capacity." *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir. 1985). The ALJ's RFC decision can be supported by substantial evidence even if the ALJ does not specifically discuss all the evidence that supports his or her decision or all the evidence that he or she rejected. *Falco v. Shalala*, 27 F.3d 160, 163-64 (5th Cir. 1994). A reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if the court would reach a different conclusion based on the evidence in the record. *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988); *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). The court "may only scrutinize the record" and take into account whatever fairly detracts from the substantiality of the evidence supporting the ALJ's decision. *Leggett*, 67 F.3d at 564. Accordingly, a "no substantial evidence" finding is appropriate

---

[85] AR pp. 599-606, 930-40, 958-95.
[86] AR pp. 934, 935, 937. A treatment note from Dr. Edwards dated October 14, 2008, before the alleged onset date, also includes a diagnosis of "Lumbar disc dz." AR p. 939.
[87] AR p. 930.
[88] AR p. 931.
[89] AR p. 977.

only if there is a conspicuous absence of credible evidentiary choices or no contrary medical findings to support the ALJ's decision. *Johnson*, 864 F.2d at 343-44.

In assessing credibility, the ALJ must consider the entire record, including medical signs and laboratory findings and statements by the claimant and his or her treating or examining sources concerning the alleged symptoms and their effects. 20 C.F.R. § 404.1529(c)(1). Additionally, the regulations provide a non-exclusive list of factors that the ALJ must consider. See 20 C.F.R. § 404.1529(c) (2011). The Fifth Circuit has held that the ALJ is not required to follow "formalistic rules" in assessing credibility, and the ALJ must articulate his or her reasons for rejecting a claimant's subjective complaints only "when the evidence clearly favors the claimant." *Falco v. Shalala,* 27 F.3d 160, 163 (5th Cir. 1994). Ultimately, "The mere existence of pain does not automatically create grounds for disability, and subjective evidence of pain will not take precedence over conflicting medical evidence." *Harper v. Sullivan*, 887 F.2d 92, 96 (5th Cir. 1989) (citation omitted). Likewise, an individual's statements regarding pain and other symptoms alone are not conclusive evidence of disability and must be supported by objective evidence of a medical impairment that could reasonably be expected to produce the pain or other symptoms alleged. *Id.* (*quoting* 42 U.S.C. § 423(d)(5)(A)).

Here, the ALJ found that while Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, Plaintiff's statements concerning the intensity, persistence and limiting effects of these symptoms were not entirely credible.[90] The ALJ found that Plaintiff's "representations of asserted eroded physical and mental functioning lacks longitudinal and charted deficits substantiated in the totality of the objective record of care to the degree he has alleged."[91] The ALJ concluded that, "The majority of the medical records of care

---

[90] AR p. 33.
[91] AR p. 33.

do not reflect that claimant ever related the need for his wife to assist him with dressing and toileting due to lower extremity weakness, as well as his inability to lift objects weighing more than 20-pounds, perform all household chores and driving."[92]  The ALJ further found that:

> The collective representations claimant made to his attending medical providers discussed <u>infra</u> regarding the purported 'head and spine' injuries he sustained from the motorcycle crash in 2004 with alleged residual effects on his mental and physical functioning have been grossly embellished given the totality of normative diagnostic studies on x-rays, CT scans, MRIs and EMG testing, documenting the presence of degenerative changes for claimant, which at no time warranted invasive surgical intervention to his head, spine and extremities (aside from therapeutic ESIs with semi-relief of pain reported by him) and the absence of any prescribed assistive devices for his daily functioning.[93]

The ALJ's findings in this case are supported by substantial evidence.  The medical evidence pertaining to the treatment received after Plaintiff's alleged onset date of August 14, 2010 includes X-Rays and a lumbar myelogram study from January 2011, the results of which were "relatively benign," "negative for acute fracture or dislocation" and "normal with no problems detected" at L5-S1.[94]  Although an EMG study performed in February 2011 showed "mild acute L5-S1 radiculopathy on the left,"[95] Dr. McCarthy's records from February 2011 indicate that Plaintiff was "in no acute distress" and "moves all extremities without difficulty."[96]  Similarly Dr. McCarthy's records from April 12, 2011 and from October 4, 2011, the date Plaintiff was discharged, state that he was, "in no acute distress" and "moves all extremities without difficulty."[97]  Accordingly, Plaintiff's complaints of pain were not supported by the objective medical evidence.

---

[92] AR p. 34.
[93] AR p. 34.
[94] AR pp. 683, 691-92.
[95] AR pp. 706, 903-07.
[96] AR pp. 682, 902.
[97] AR pp. 894, 896.

Further, "a factfinder's evaluation of the credibility of subjective complaints is entitled to judicial deference if supported by substantial record evidence." *Villa v. Sullivan*, 895 F.2d 1019, 1024 (5th Cir. 1990) (citing *Hollis v. Bowen*, 837 F.2d 1378, 1384 (5th Cir. 1988)). The Court has reviewed the record and finds that the ALJ's determination regarding Plaintiff's chronic back pain is supported by substantial evidence. While the medical records show that Plaintiff's chief complaints often included pain in his lower back or legs, as discussed above, the medical tests performed after Plaintiff's alleged onset date of August 14, 2010, including X-Rays, MRIs, and EMG's of Plaintiff's lumbar and cervical spine, produced mixed results, with most tests returning negative or normal results. Thus, there is objective medical evidence to support the ALJ's finding that Plaintiff's "representations of asserted eroded physical and mental functioning lacks longitudinal and charted deficits substantiated in the totality of the objective record of care to the degree he has alleged,"[98] and, therefore the ALJ's RFC determination that did not impose greater limitations for Plaintiff's alleged back pain.

### B. The Weight Given to Dr. Gouvier's Opinion

In his first assignment of error, Mr. Collums alleges that the ALJ erred by failing to consider or give weight to the medical opinion of Dr. Wm. Drew Gouvier, Ph.D. At the request of Louisiana Rehabilitation Services, Dr. Gouvier conducted a neuropsychological assessment of Plaintiff on August 9, 2010 and issued a Neuropsychological Evaluation on August 14, 2010.[99] Dr. Gouvier's test results indicated that Plaintiff 's intellectual functioning lies within the low average range on the Wechsler Adult Intelligence Scale-Third Edition ("WAIS-III") and that his memory functioning falls within the borderline to average ranges on the Wechsler Memory Scale-

---

[98] AR p. 33.
[99] AR pp. 591-97.

Third Edition ("WMS-III").[100]  The test results also indicated that Plaintiff's attention and concentration functioning fell within the borderline to average ranges on the WAIS-III and WMS-III.[101]  With respect to Plaintiff's measure of attention, Dr. Gouvier found that, "When Mr. Collums is taking Adderall, his attention and concentration problems appear to be well-managed."[102]  Dr. Gouvier diagnosed Plaintiff as having cognitive disorder not otherwise specified, anxiety disorder not otherwise specified and pain disorder associated with both psychological factors and a general medical condition.[103]  In addition to these diagnoses, Dr. Gouvier included a list of "Recommendations" in his report, which provides, in pertinent part, the following:

> 4. Mr. Collums should take short, frequent breaks (about every 30 minutes take a 3-4 minute break) in order to improve attention and maximize productivity.  Other suggestions for minimizing distractions and improving attention and concentration include:
>    - Reconstructing his environment (e.g., shut doors and windows, turn off computers and machines) to minimize distractions due to background noise and work facing a wall rather than a window or hallway whenever possible.
>    - Talking himself through a task ("self-coaching") to help keep focused on what he is doing[.][104]

The ALJ's August 29, 2014 decision states that Dr. Gouvier's psychological opinion "was found to have clinical substantiation in the record of evidence and with the valid objective findings on WAIS-III testing in which claimant achieved a full-scaled score of 84 (low average range of intellectual functioning) and on WMS-III memory findings (borderline to average range of general memory functioning)."[105]  The ALJ also found that, "these respective studies and results were not

---

[100] AR pp. 592-93.
[101] AR p. 593.
[102] AR pp. 593-94.
[103] AR p. 596.
[104] AR pp. 596-97.
[105] AR pp. 34-35.

controverted by any other diagnostic studies or tools.  SSR 06-3p."[106]  The ALJ makes no reference to the list of Recommendations contained in Dr. Gouvier's report.

Mr. Collums contends that the ALJ erred by not giving any weight or consideration to Dr. Gouvier's "opinion" that Plaintiff requires short, frequent breaks every half hour to improve attention and productivity.[107]  Mr. Collums asserts that when these findings were presented to the Vocational Expert ("VE") during the administrative hearing, the VE testified that Plaintiff would be unable to sustain competitive gainful employment."[108]  Based on the VE testimony, Mr. Collums asserts that Plaintiff's application for disability benefits should have been approved at step five of the sequential analysis.

The Commissioner asserts that Dr. Gouvier's recommendation does not constitute a medical opinion and was merely included in a list of "academic/vocational accommodations" to assist Plaintiff in maximizing his performance despite his limitations.[109]  The Commissioner argues that recommendations intended to "improve" and "maximize" are clearly not a description of Plaintiff's baseline functioning at the time of examination, nor are they presented as mandatory requirements for unskilled work activity.[110]  The Commissioner points out that Mr. Collums does not argue that any of Dr. Gouvier's other recommendations constitute medical opinions or mandatory work requirements.

The Commissioner further asserts that Plaintiff's alleged inability to work without frequent breaks cannot be reconciled with Dr. Gouvier's test results or his opinion that Plaintiff's "concentration problems appear to be well-managed" with medication.[111]  The Commissioner

---

[106] AR p. 35.
[107] R. Doc. 10-1 at 10-11.
[108] R. Doc. 10-1 at 11.
[109] R. Doc. 12 at 5 (*citing* AR pp. 596-97).
[110] R. Doc. 12 at 5 (*citing* AR p. 596).
[111] R. Doc. 12 at 6 (*citing* AR p. 594).

likewise argues that the VE's testimony does not confirm Plaintiff's inability to work based upon Dr. Gouvier's recommendation. While Dr. Gouvier recommended that Plaintiff take a three to four minute break every thirty minutes to maximize productivity, Plaintiff's counsel asked the VE to assume an individual who must take a break of "at least ten minutes" every half hour.[112] The VE testified that an individual under Plaintiff's counsel's hypothetical, who could not perform work for at least one-third of the workday, was unemployable. The Commissioner argues the testimony elicited from the VE does not support Mr. Collums' claim of error because Plaintiff's counsel's hypothetical does not accurately reflect Dr. Gouvier's recommendation.

### 1. Plaintiff's Mental Health Treatment

### a. Mental Health Records Prior to Alleged Onset

The record shows that in March 2009, Dr. Christopher Lee, M.D., referred Plaintiff to Dr. Joseph A. Acosta, M.D., for a neurology consult in connection with Plaintiff's complaints of back pain and leg pain.[113] After examining Plaintiff, Dr. Acosta found that Plaintiff was awake, alert, oriented, fluent and could name, repeat and comprehend. Dr. Acosta also found that Plaintiff's "Attention span, concentration, general fund of knowledge, recent and remote memory is normal."[114]

From August 6, 2009 through September 17, 2012, Plaintiff was treated by psychiatrist Dr. Ashwin Sura, M.D.[115] The initial treatment note dated August 6, 2009 states that Plaintiff was treated by a "Dr. Todd" for ten years for problems with attention deficit hyperactivity disorder ("ADHD"), back pain from a 2002 motorcycle accident, and poor sleep.[116] During the initial visit,

---

[112] R. Doc. 12 at 7 (*citing* AR p. 80).
[113] AR p. 500.
[114] AR p. 501.
[115] AR pp. 576-77, 642-53, 916-27, 941-48, 996-1001.
[116] AR pp. 643-45.

Dr. Sura diagnosed Plaintiff with ADHD, anxiety disorder not otherwise specified, sleep issues and chronic pain and prescribed the following medications: Adderall 20 mg, Xanax 1 mg, Seroquel 100 mg and Remeron 30 mg.[117]  In the treatment notes from Plaintiff's following visit on October 14, 2009, Dr. Sura noted that Plaintiff could not lift objects weighing more than 20 pounds.[118]  On November 6, 2009, Dr. Sura noted that Plaintiff was going through OxyContin withdrawal.[119]

On February 22, 2010, Dr. Sura continued Plaintiff on his medications, but added a prescription for Cymbalta 60 mg.[120]  On June 7, 2010, Dr. Sura discontinued Plaintiff's prescription for Remeron, but continued him on Adderall, Xanax, Seroquel, and Suboxone.[121]  Dr. Sura's treatment notes also contain a notation regarding a June 8, 2010 phone call from Plaintiff requesting that Dr. Sura prescribe Plaintiff's wife his medication of Suboxone.[122]  Dr. Sura refused Plaintiff's request and advised Plaintiff of the illegal nature of such a suggested action.[123]

### b. Mental Health Records After Alleged Onset Date

Dr. Sura issued a letter dated October 17, 2010 advising that Plaintiff has been diagnosed with ADHD and anxiety order and that his current medications include Adderall 30 mg, Xanax 2 mg and Remeron 30 mg.[124]  At the January 31, 2011 office visit, Plaintiff informed Dr. Sura that he had filed for disability benefits and was not taking any pain medications.[125]  The treatment notes from that visit show that Plaintiff was prescribed Adderall 30 mg, Xanax 2 mg and Neurontin 600 mg.[126]  When Plaintiff returned to Dr. Sura for a visit on June 24, 2011, Plaintiff reported that he

---

[117] AR p. 644.
[118] AR p. 645.
[119] AR p. 645.
[120] AR p. 645.
[121] AR pp. 648-49.
[122] AR p. 648.
[123] AR p. 648.
[124] AR p. 650.
[125] AR p. 652.
[126] *Id*.

had received a second DWI and had committed battery on a State police officer.[127]  During an October 5, 2011 visit, Plaintiff reported that he was disabled and unable to function.[128]  In his treatment notes from a December 16, 2011 visit, Dr. Sura noted that Plaintiff was in "constant pain."[129]

On or about May 15, 2012, Dr. Sura sent a letter to Plaintiff's counsel, forwarding a Longitudinal Psychiatric Evaluation of Plaintiff.[130]  In the assessment, Dr. Sura states that he treated Plaintiff when Plaintiff was nine years old, initially diagnosing Plaintiff with ADHD and oppositional defiant disorder ("ODD"), which was later modified to mood disorder with psychosis.[131]  According to the assessment, Plaintiff underwent counseling and inpatient hospitalization at Parkland Hospital as a child, but he was never well enough to function.  Dr. Sura did not treat Plaintiff again until Plaintiff returned when he was 31 years old, but Dr. Sura noted that Plaintiff had been seen by another psychiatrist, Dr. Kenneth Todd, M.D., since he was 16 years old.[132]  In the May 15, 2012 assessment, Dr. Sura diagnosed Plaintiff with ADHD, generalized anxiety disorder ("GAD"), psychosis not otherwise specified, polysubstance abuse disorder in the past, passive aggressive personality disorder, chronic pain, possible Fibromyalgia, and gave Plaintiff a Global Assessment of Function ("GAF") score of 50 (current) and 65 (past).[133]  Based upon his mental health alone, Dr. Sura concluded that Plaintiff was "completely and permanently disabled."[134]  Dr. Sura noted that Plaintiff "has greater insight now than ever" and that, "He has been taking very little pain medications."[135]

---

[127] AR p. 919.
[128] AR p. 919.
[129] AR p. 999.
[130] AR p. 942.
[131] AR p. 943.
[132] AR p. 944.
[133] AR p. 947.
[134] AR p. 947.
[135] AR p. 947.

Plaintiff returned to Dr. Sura on July 11, 2012 and September 17, 2012 for follow-up care.[136]  The treatment notes from September 17, 2012 show that Plaintiff's memory was "intact" and his insight and judgment were considered "good."[137]  Plaintiff was also prescribed Ativan 1 mg, Vyvanse 70 mg, Seroquel 300 mg and Klonopin 1 mg.[138]  After reviewing Dr. Sura's treatment notes in great detail, the ALJ concluded that Dr. Sura's treatment notes "are significantly and longitudinally devoid of consistent assessment and/or notation/recordation of claimant's reported complaints and current functioning for his sleep, appetite, speech/language, symptom distortion/magnification, thinking, understanding, memory, activities of daily living and any side effects, including sedation/eroded concentration functioning from his plethora of prescribed medications."[139]  The ALJ further found that, "the clinical record of Dr. Sura does not yield any complaints by claimant that he could not independently attend to his personal needs, drive, perform household chores or interact socially with others."[140]

On July 29, 2011, Dr. Joseph Tramontana, Ph.D., also reviewed Plaintiff's disability file at the request of DDS.[141]  Dr. Tramontana concluded that Plaintiff had the mental RFC to perform and carry out short, simple and detailed instructions with moderate limitations affecting his ability to attend and concentrate for extended periods, sustain and adhere to performing activities within a schedule/ordinary routine without special supervision, work in coordination with or in proximity to others without being distracted, make simple work-related decisions, with moderate limitations affecting his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable

---

[136] AR pp. 997-98.
[137] AR p. 997.
[138] AR p. 1000.
[139] AR p. 31.
[140] AR p. 31.
[141] AR pp. 114-24.

number and length of rest periods based on Plaintiff's history of treatment for ADHD.[142]  However, Dr. Tramontana found that Plaintiff's problems "appear primarily physical, and he may have been feigning the severity of mental limitations according to the CEP."[143]  Dr. Tramontana further concluded that, "Nevertheless, with adequate motivation, he should be able to maintain the concentration, persistence, and pace and be able to get along with coworkers and supervisors at a level consistent with the requirements of unskilled labor."[144]

On July 25, 2011, Plaintiff underwent a consultative psychological assessment with Dr. James A. Van Hook, III., Ph.D., at the request of DDS.[145]  Plaintiff's chief complaints at that time included ADHD, anxiety disorder, dyslexia, depression, brain damage from an accident, memory loss, a spine/neck injury, neuropathic nerve pain, nerve inflammation and hormone deficiency.[146]  During the examination, Dr. Van Hook found that Plaintiff's motivation was equivocal, his persistence was marginal at times and he seemed to give up easily, and his pace was unremarkable.[147]  Dr. Van Hook opined that, "The results of the examination were felt to be a spuriously low estimate of his cognitive functioning and an inflated depiction of his socioemotional/behavioral status."[148]  With respect to Plaintiff's mental status, Dr. Van Hook found that Plaintiff was anxious, but did not appear to be in acute distress.  Dr. Van Hook found that Plaintiff's thinking was intact, logical and coherent and he was oriented to person, place, time and situation.[149]  Plaintiff reported having some memory problems as a result of his 2004

---

[142] AR p. 122.
[143] AR p. 122.
[144] AR p. 122.
[145] AR pp. 858-60.
[146] AR p. 585.
[147] AR p. 589.
[148] AR p. 859.
[149] AR p. 859.

motorcycle accident and showed difficulty clarifying information and with focus during Dr. Van Hook's interview.[150]

In his Psychological Source Statement, Dr. Van Hook noted that Plaintiff was cooperative, but had shown questionable motivation, opining that, "He has a history of emotional and cognitive problems but today was felt to show symptom magnification of his limitations."[151]  Dr. Van Hook found that Plaintiff's "ability to maintain attention/concentration for performance of simple repetitive tasks was not adequate and he showed some continued memory problems.  His ability to respond appropriately to supervision and interact appropriately with others was a thought [sic] to be fair and he denied that he's ever been fired from a job."[152]  Dr. Van Hook also found that Plaintiff's ability to sustain effort and persist at a normal pace over the course of a routine 40-hour workweek "is reportedly impaired by his physical limitations and he stated that he is quite dependent on analgesics to get going and perform the simplest of tasks."[153]  Dr. Van Hook's clinical impression was that Plaintiff suffered from bipolar disorder, cognitive disorder not otherwise specified, possible malingering and a history of polysubstance dependence.[154]

On May 8, 2012, at the request of his counsel, Plaintiff was referred to Dr. Lester Clayton Culver, Ph.D., for a psychological assessment.[155]  Plaintiff complained that he had suffered brain damage as a result of a motorcycle accident that has eroded his ability to concentrate, and reported feelings of depression, diminished memory functioning, ADHD, insomnia, dyslexia, anger issues and chronic pain with body twitching/shaking.[156]  Plaintiff reported that his wife takes care of him and helps him get in and out of bed.  Dr. Culver found Plaintiff's wife to be "a fair informant" and

---

[150] AR p. 859.
[151] AR p. 860.
[152] AR p. 860.
[153] AR p. 860.
[154] AR p. 860.
[155] AR pp. 950-55.
[156] AR p. 950.

that, "Some of the patient's statements were inconsistent with the included materials."[157] Plaintiff's results from the "MMPI-2" test were considered invalid, which Dr. Culver explained may occur "when someone exaggerates symptoms, is experiencing acute panic or is making a cry for help."[158] Dr. Culver noted that Plaintiff was cooperative and alert during the interview, showed adequate motivation and did not get distracted by extraneous noises.

In his summary, Dr. Culver concluded that Plaintiff "appears to be a severely depressed man who has PTSD."[159] Although Dr. Gouvier had diagnosed Plaintiff with a cognitive disorder not otherwise specified, Dr. Culver stated that, "I do not know if his memory and attention have worsened since Dr. Gouvier saw him due to further organic damage, but I believe ADHD captures the severity of his cognitive difficulties better than a cognitive disorder NOS."[160] Dr. Culver further found that Plaintiff "ascribed his need for help to chronic pain, but I strongly suspect depression is involved. His memory and attention were poor today, and he was irritable. Part of the irritability may be due to frontal lobe damage."[161] Dr. Culver opined that Plaintiff's effort and attention varied with his affect and complaints of pain, and that Plaintiff "would not get along with others at a job over long periods. His coughing, agitation and complaints of pain would make him difficult to deal with on a job. The patient had difficulty tolerating the testing process and will not be able to deal with the stress common on most jobs."[162] Dr. Culver diagnosed Plaintiff with ADHD, pain disorder associated with both psychological factors and a general medical condition, major depressive disorder, PTSD, personality disorder not otherwise specified, as having psychosocial and environmental problems, and a GAF score of 35.[163]

---

[157] AR p. 950.
[158] AR p. 953.
[159] AR p. 954.
[160] AR p. 954.
[161] AR p. 954.
[162] AR p. 955.
[163] AR p. 955.

## 2. The Treating Physician Rule

Generally, the "opinion of the treating physician who is familiar with the claimant's impairments, treatments and responses, should be accorded great weight in determining disability." *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000); *see also,* 20 C.F.R. § 404.1527(c)(1) (examining physician opinion given more weight than non-examining physician).[164]  However, the ALJ may reject the treating source's opinion when "there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another." *Walker v. Barnhart*, 158 F. App'x 534, 535 (5th Cir. 2005) (quoting *Newton*, 209 F.3d at 458).  If the ALJ's decision is supported by substantial, contradictory, first-hand evidence from another physician, the ALJ is "not required to go through all six steps in *Newton* [because] . . . the ALJ is responsible for resolving conflicts in the evidence, and we will not substitute our judgment for his." *Cain v. Barnhart*, 193 Fed. App'x 357, 360 (5th Cir. 2006) (citing *Newton*, 209 F.3d at 452, 458; *Walker*, 158 Fed. App'x at 534)).  Further, "the ALJ may give 'less weight, little weight, or even no weight' to the opinion of a treating physician

---

[164] For claims filed on or after March 27, 2017, the federal regulations provide:

> We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources.  When a medical source provides one or more medical opinions or prior administrative medical findings, we will consider those medical opinions or prior administrative medical findings from that medical source together using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate.  The most important factors we consider when we evaluate the persuasiveness of medical opinions and prior administrative medical findings are supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section).  We will articulate how we considered the medical opinions and prior administrative medical findings in your claim according to paragraph (b) of this section.

20 C.F.R. § 404.1520c.  Because Plaintiff's claim was filed prior to March 27, 2017, the treating physician rule set forth in 20 C.F.R. § 404.1527 controls.

upon a showing of good cause." *Ray v. Barnhart*, 163 Fed. App'x 308, 313 (5th Cir. 2006) (quoting *Myers v. Apfel*, 238 F.3d 617, 621 (5th Cir. 2001)).

In summary, an ALJ is free to discredit the opinion of a treating physician when it is contradicted by the evidence in the record. *Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1987) (ALJ may reject a treating physician's opinion in favor of an examining physician where the evidence supports a contrary conclusion). Where an ALJ has found a treating physician's opinion to be inconsistent with that physician's own treatment records and other evidence in the record, this court has affirmed the ALJ's rejection of that opinion. *See, Villar v. Colvin*, Civil Action No. 14-562, 2015 WL 7731400 (M.D. La. Oct. 8, 2015) (affirming ALJ's rejection of treating physician's opinion where physician's own notes and other notes in the record failed to support the physician's opinion); *Miller v. Colvin*, Civil Action No. 14-675, 2016 WL 1178391, at *4 (M.D. La. Feb. 25, 2016) (affirming ALJ's decision to afford little weight to treating psychiatrist's Mental Medical Source Statement where Statement was unsupported by psychiatrist's own treatment notes).

While the Court agrees that generally, an examining physician's opinion should be accorded great weight, the ALJ's decision to not give any weight to the Recommendations contained in Dr. Gouvier's Neuropsychological Evaluation is supported by substantial evidence and, therefore, is not a ground for reversal or remand. As an initial matter, Dr. Gouvier's recommendation that Plaintiff "should take short, frequent breaks (about every 30 minutes take a 3-4 minute break) in order to improve attention and maximize productivity," is not a medical opinion. "Medical opinions are statements from physicians and psychologists or other 'acceptable medical sources' that reflect judgments about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do

despite the impairment(s), and physical and mental restrictions."  SSR 06-3p, 2006 WL 2329939, at *2 (2006) (*citing* 20 CFR 404.1527(a)(2) and 416.927(a)(2)).  Dr. Gouvier's recommendation is not a judgment about the nature and severity of Plaintiff's alleged impairments, what Plaintiff can still do despite the impairments, or Plaintiff's physical and mental restrictions.  According to Dr. Gouvier's report, the Recommendations are merely suggestions for how Plaintiff can "improve attention and maximize productivity."[165]  Thus, Dr. Gouvier's recommendation that Plaintiff take frequent breaks to improve concentration is not a medical opinion entitled to any particular weight under the regulations.

To the extent that Dr. Gouvier's recommendation for frequent breaks does constitute a medical opinion, the ALJ's failure to consider or weigh the opinion does not constitute reversible error because the opinion is not supported by the medical evidence of record.  First, the notion that Dr. Gouvier's recommendation for frequent breaks constitutes a mandatory work requirement is inconsistent with and contradicts Dr. Gouvier's conclusion that, "When [Plaintiff] is taking Adderall, his attention and concentration problems appear to be well-managed."[166]  This Court has affirmed an ALJ's rejection of a treating physician's opinion that was inconsistent with the physician's own treatment records and other evidence in the record.  *See, Villar v. Colvin*, Civil Action No. 14-562, 2015 WL 7731400 (M.D. La. Oct. 9, 2015).  The Fifth Circuit has similarly held that an ALJ may give less weight to a treating physician's opinion when good cause is shown, as is the case when his statement as to disability is so brief and conclusory that it lacks strong persuasive weight, is not supported by medically acceptable clinical laboratory diagnostic

---

[165] AR p. 596.
[166] AR p. 594.  Mr. Collums' argument that Dr. Gouvier's recommendation would be a mandatory work requirement also seems inconsistent with Dr. Gouvier's findings that Plaintiff attained scores on indices of attention and concentration that fell within the "borderline to average ranges," (AR p. 593) and that his "cognitive control of attention and concentration was on par with his intellectual functioning" (AR p. 596), with intellectual functioning in the low average range.  (AR p. 595).

techniques, or *is otherwise unsupported by the evidence. Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985) (emphasis added).

Dr. Gouvier's recommendation for Plaintiff to take frequent breaks is also not supported by the other medical evidence of record, as none of Plaintiff's other treating or examining physicians opined that Plaintiff needed to take frequent breaks during an eight-hour workday to maintain attention and concentration. While Plaintiff was consistently diagnosed with ADHD by his treating and examining physicians,[167] Plaintiff's condition, which impairs attention and concentration, was also consistently treated with, and seemingly controlled by, prescription medication, including Adderall and Vyvanse. Additionally, when Dr. Van Hook performed a psychological assessment of Plaintiff on July 25, 2011, he found that Plaintiff's ability to maintain attention and concentration for the performance of simple, repetitive tasks was not adequate, but that, "The results of the examination were felt to be a spuriously low estimate of his cognitive functioning and an inflated depiction of his socioemotional/behavioral status."[168] During a psychological assessment performed nearly a year later on May 8, 2012, Dr. Culver similarly found that although Plaintiff's attention was poor, his test results were considered invalid, which can occur "when someone exaggerates symptoms, is experiencing acute panic or is making a cry for help."[169] Neither Dr. Van Hook nor Dr. Culver mention any need for Plaintiff to take frequent breaks to improve his attention and concentration.

Although Plaintiff's treating psychologist, Dr. Sura, concluded in his May 15, 2012 Longitudinal Psychiatric Evaluation that Plaintiff was, "completely and totally disabled" based upon his mental health, such conclusory statements are not entitled to any special weight. "[S]ome

---

[167] AR pp. 644, 942, 955, 977, 1000.
[168] AR pp. 859-60.
[169] AR p. 953.

opinions by physicians are not medical opinions, and as such have no 'special significance' in the ALJ's determination." *Frank v. Barnhart*, 326 F.3d 618, 620 (5th Cir. 2003) (*quoting* 20 C.F.R. § 404.1527(e) & (e)(3)). "Among the opinions by treating doctors that have no special significance are determinations that an applicant is 'disabled' or 'unable to work.' These determinations are legal conclusions that the regulation describes as 'reserved to the Commissioner.'" *Frank*, 326 F.3d at 620 (*quoting* 20 C.F.R. § 404.1527(e)(1)). Because Dr. Sura's opinion constitutes a legal conclusion that is not entitled to any weight by the ALJ, it does not contradict the ALJ's decision to give zero weight to Dr. Gouvier's recommendation that Plaintiff take frequent breaks to improve concentration.

The weight given to Dr. Gouvier's recommendation is also not contradicted by the VE testimony elicited during the May 23, 2014 administrative hearing. As the Commissioner points out, the VE was not presented with a hypothetical question regarding an individual who must take a three to four minute break every thirty minutes, as recommended by Dr. Gouvier. Instead, the VE was asked by Plaintiff's counsel to testify regarding whether an individual who is required to take a break of, "At least ten minutes" every half hour is capable of sustaining full-time employment.[170] The VE testified that such breaks would prevent the individual from maintaining employment based upon, "Time lost taken away from tasks."[171] While an individual under the hypothetical question posed to the VE would be unable to work for two hours and forty minutes, or nearly one-third of an eight-hour workday, Dr. Gouvier's recommendation would only involve an inability to work for a maximum of 64 minutes out of an eight-hour workday. As such, the VE testimony does not support Plaintiff's position that the ALJ erred by failing to give any weight to Dr. Gouvier's recommendation for frequent breaks. Further, the ALJ's RFC determination limits

---

[170] AR p. 80.
[171] AR p. 80.

Plaintiff to performing jobs that involve "simple and repetitive tasks, with occasional and superficial contact with the public, co-workers and supervisors, in work environments that do not require fast paced work and production quotas,"[172] which appears to account for Plaintiff's limitations with respect to attention and concentration.

Accordingly, substantial evidence supports the ALJ's decision regarding the weight given to Dr. Gouvier's recommendation that Plaintiff should take a three to four minute break every thirty minutes "to improve attention and maximize productivity." Not only does Dr. Gouvier's recommendation not constitute actual medical opinion evidence, but it is not supported by the objective medical evidence of record. As such, Mr. Collums' first assignment of error lacks merit.

## RECOMMENDATION

For the reasons set forth herein, it is the recommendation of the Magistrate Judge that under sentence four of 42 U.S.C. § 405(g), the final decision of the acting Commissioner of Social Security, Carolyn W. Colvin, denying the application for disability insurance benefits filed by plaintiff, Scott Brandon Collums, be **AFFIRMED** and this action be **DISMISSED WITH PREJUDICE**

Signed in Baton Rouge, Louisiana, on August 28, 2017.

**ERIN WILDER-DOOMES**
**UNITED STATES MAGISTRATE JUDGE**

---

[172] AR p. 26.